# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# DELTA DIVISION

| | | |
|---|---|---|
| JOHN W. FRAZIER, | * | |
| REG. #19124-033 | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | No. 2:20-cv-00215-JJV |
| | * | |
| RYAN POYNOR, Assistant | * | |
| Health Services Administrator, *et al.* | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

**I.   INTRODUCTION**

John W. Frazier ("Plaintiff") is a prisoner in the Federal Medical Center in Fort Worth, Texas. He has filed a *pro se* Amended Complaint, pursuant to *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging he received constitutionally inadequate medical care for hidradenitis suppurativa and back pain while he was a federal prisoner in Arkansas from September 19, 2018 to December 2, 2020. (Doc. 12.) The remaining Defendants are Assistant Health Services Administrator ("HSA") Ryan Poynor, PA Michelle Wingo, RN Lu-Juana Yates, RN Brandon Wooten, RN Rhonda Langley, RN Kathy Cook, RN Sheryl Phillips, Medical Technician Stacy Hill, Dr. Nwannem Obi-Okoye, and Dr. Hari Kapur. (*Id.*) All other claims and Defendants have been dismissed without prejudice. (Docs. 27, 46.) Plaintiff seeks monetary damages and injunctive relief against Defendants in their official and personal capacities. (Doc. 12.) And all parties have consented to proceed before me. (Doc. 54.)

Defendants Cook, Hill, Langley, Phillips, Poynor, Wingo, Wooten, and Yates have filed a Motion for Summary Judgment. (Docs. 116-118). Defendants Obi-Okoye and Kapur have filed a separate Motion for Summary Judgment. (Docs. 119-121.) Plaintiff has responded to both

Motions, and Defendants have replied. (Docs. 131-135, 139, 141-142.) After careful consideration and for the following reasons, the Motions for Summary Judgment are granted, and Plaintiff's claims against the remaining ten Defendants are dismissed with prejudice.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A).

When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of W. Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

**III.    FACTS**

The facts taken largely from Plaintiff's extensive medical records and viewed in the light most favorable to him are as follows.  Plaintiff arrived at the federal prison in Arkansas on September 19, 2018, when he was twenty-five years old.  (Doc. 117-2 at 1-26.)  During his intake exam, PA Wingo noted Plaintiff was clinically obese, had a lumbar fusion in 2015, and suffered from chronic hidradenitis suppurativa ("HS").[1]  Plaintiff had scattered HS sores on his neck and trunk, but no drainage or signs of infection.  After determining Plaintiff had a full range of motion in his back with some difficulty with flexion, PA Wingo prescribed naproxen for pain, ordered spinal x-rays, scheduled medical monitoring at least every six months, and adjusted Plaintiff's housing and work assignments.  Dr. Obi-Okoye approved those orders, added doxycycline for treatment of HS, and recommended Plaintiff lose weight.

On October 10, 2018, Plaintiff did not appear for his back x-rays.  (Doc. 117-2 at 46-78.)  Later that month and in November 2018, Plaintiff had HS sores on his neck, back, and underarms that began to drain.  PA Wingo renewed doxycycline while RN's Wooten and Yates cleaned and treated Plaintiff's HS wounds.  In December 2018, a non-party nurse practitioner ordered clindamycin, a rocephin shot, and daily dressing changes (which Plaintiff sometimes skipped) to treat several ruptured and infected HS sores Plaintiff's neck and underarm.  PA Wingo reviewed those orders, added keflex, and submitted a request for a dermatology consultation, which was approved and scheduled by a third-party administrator for June 17, 2019.

---

[1] HS is a "chronic, often debilitating, skin condition that historically does not respond well to treatment." (Doc. 117-5 at 100; *see also* Doc. 117-6.)  HS "manifests as painful, deep seated, inflamed lesions, including nodules, sinus tracts, and abscesses," and is graded from stage 1 to 3, with stage 3 being the most severe. (*Id.*)  It is a "relentless," "unyielding" condition that "often does not respond to treatment." (Doc. 121-2 at 1.)  "Although there is no cure for HS, symptoms may be managed" with antibiotics and other medications. (Doc. 117-5 at 100).

In January 2019, PA Wingo replaced naproxen with indomethacin, which is a prescription non-steroid anti-inflammatory, to treat Plaintiff's back pain. (Doc. 117-2 at 80-130.) On February 1, 2019, Plaintiff asked that a 3 cm HS sore on his back be lanced. Dr. Obi-Okoye decided to treat it with oral and injected antibiotics instead. The knot worsened, and on February 4, 2019, PA Wingo lanced it and sought permission to prescribe augmentin, which is a non-formulary antibiotic. The Bureau of Prisons ("BOP") denied that request and instructed her to try a longer course of doxycycline. On February 12, 2019, Dr. Obi-Okoye reviewed the lab reports finding no significant bacteria growth. From March to May 2019, Plaintiff's HS worsened, with a lab test detecting moderate bacterial growth. PA Wingo prescribed amoxicillin, doxycycline, and ciprofloxacin, with the later medication being approved by Dr. Obi-Okoye. In early May 2019, PA Wingo increased Plaintiff's indomethacin in response to his complaints of back pain and ordered a new x-ray. Dr. Obi-Okoye reviewed the x-ray report stating the surgical hardware from the Plaintiff's prior lumbar was intact and there was no evidence of current fracture or malalignment.

On May 22, 2019, PA Wingo contacted Dr. Obi-Okoye because Plaintiff had scattered pustules on his underarm, trunk, back, and two large draining pustules on his neck with sinus tracking. (Doc. 117-2 at 131-163; Doc. 117-3 at 1-21). Dr. Obi-Okoye consulted with a private general surgeon, who recommended Plaintiff be taken to a local hospital for treatment (*Id.*) Plaintiff was admitted into the Forrest City Medical Center from May 22 to 31, 2019, where his HS sores and surrounding cellulitis were treated with IV antibiotics. And a surgeon debrided two 4x4 cm HS areas with sinus tracking on his back. The surgeon concluded Plaintiff was not a candidate for monoclonal antibody therapy, prescribed oral antibiotics for ten days, recommended Plaintiff continue doxycycline thereafter, noted Plaintiff's obesity was exacerbating his symptoms,

4

and counseled Plaintiff on diet changes and exercise. PA Wingo followed the surgeon's recommendations, which were approved by Dr. Obi-Okoye, when Plaintiff returned to prison on May 31, 2019. And she added daily wound cleanings which Plaintiff sometimes did not attend.

On June 17, 2019, Plaintiff went to his first appointment with a private dermatologist. (Doc. 117-3 at 23-87.) Plaintiff's surgical wounds were healing, but he had several HS sores in his armpits and on his trunk causing the dermatologist to diagnose him with stage 2 HS. The dermatologist recommended Plaintiff continue doxycycline, start chlorhexidine washes daily, receive weekly Humira injections <u>after</u> his surgical wounds had completely healed, and return for a follow-up visit in three months. Dr. Obi-Okoye and PA Wingo carried out those recommendations and requested a follow-up visit with the dermatologist, which was scheduled for September 9, 2019. In July 2019, PA Wingo increased Plaintiff's prescription medications for back pain and gave Plaintiff' a TENS unit that he had requested. She also noted Plaintiff's HS surgical wounds were healing. But by August 2019, the wounds began to drain, and Plaintiff complained of worsening back pain. PA Wingo ordered daily wound dressings and chlorhexidine washes, which Plaintiff rarely attended. And, she submitted a request for an MRI of Plaintiff's back, which was scheduled by a third-party administrator for January 13, 2020.

On September 9, 2019, Plaintiff had his second dermatology appointment. (Doc. 117-3 at 89-140.) The dermatologist classified Plaintiff's HS as stage 2-3 because the sores had spread; recommended Plaintiff continue doxycycline and daily chlorhexidine washes; proposed Plaintiff begin weekly Humira injections; and suggested a follow-up visit in three to four months. PA Wingo and Dr. Obi-Okoye carried out those recommendations, ordered wound dressings, and renewed his prescription pain medicines. On September 27, 2019, Dr. Kapur conducted Plaintiff's yearly examination and renewed his prescriptions for back pain. Despite receiving weekly Humira

5

injections, by December 2019, Plaintiff had oozing HS sores on his neck, chest, and pubic area.

In early January 2020, the clinical director canceled Plaintiff's third dermatology appointment and MRI because there were not enough officers to escort prisoners outside of the facility.  (Doc. 117-3 at 140-145; Doc. 117-4 at 1-8.)  The third-party administrator rescheduled Plaintiff's dermatology appointment for February 2020 and his MRI for April 2020.  On January 13, 2020, PA Wingo performed an incision and drainage ("I&D") of an infected HS sore on Plaintiff's back.   Dr. Obi-Okoye reviewed the lab results which showed heavy bacterial growth. Later that month, PA Wingo treated his incision and continued his antibiotic and cleansing regime. In February 2020, Plaintiff did not show up for two of his weekly Humira shots.

On February 7, 2020, Plaintiff had his third dermatology appointment.  (Doc. 117-4 at 9-64.)  The dermatologist saw no improvement in Plaintiff's stage 2-3 HS despite receiving Humira shots and doxycycline. She recommended Plaintiff continue the course of care, start metformin, be evaluated by a surgeon, and return for a follow-up appointment in three months.[2]   PA Wingo followed those recommendations, added ciprofloxacin when a culture showed increased bacterial growth, and consulted with Dr. Obi-Okoye, who expedited a general surgeon referral to examine a large lesion on Plaintiff's back.  On March 2, 2020, a general surgeon examined Plaintiff and recommended that he be seen by a plastic surgeon.  PA Wingo requested a plastic surgery consultation and added ciprofloxacin based on lab cultures.

In April 2020, all non-emergent outside doctor appointments, including Plaintiff's May

---

[2] Plaintiff says the dermatologist recommended consultation with a plastic surgeon, and not a general surgeon. (Doc. 131 at 8.)  However, the dermatologist's clinical notes say "recommend surgery referral for evaluation" without specifying general or plastic surgery. (Doc. 117-4 at 10.) Plaintiff also says he had an allergic reaction to the dressings ordered by Defendants, but there is no medical evidence to support that assertion. (Doc. 131 at 8.)

2020 dermatology follow up and April 2020 MRI, were canceled due to the Covid-19 pandemic. (Doc. 117-1 at 42; Doc. 117-4 at 64-135.) Plaintiff tested positive for Covid-19 on April 30, 2020 and remained in isolation until June 11, 2020. However, he continued to receive HS wound dressings, Humira shots, antibiotics, and chlorhexidine washes, which he occasionally skipped. Plaintiff's HS condition continued to worsen requiring an "I&D" of an infected sore on his chest by a non-party on June 10, 2020. On June 12, June 15, and August 3, 2020, PA Wingo performed I&D's of infected HS sores on Plaintiff's neck, chest, and underarm; noted the sores had spread to his buttocks and upper thighs; prescribed levofloxacin based on lab reports; consulted Dr. Obi-Okoye; and ordered daily wound care.

In August 2020, PA Wingo obtained Dr. Obi-Okoye's permission to give Plaintiff Tylenol #3 (in addition to his two prescription medications) to treat his back pain, added augmentin based on recent HS cultures, increased his medical classification from level 2 to 3, and requested he be transferred to a federal medical unit. (Doc. 117-4 at 137-145; Doc. 117-5 at 1-98.) In September 2020, PA Wingo and Dr. Obi-Okoye decided to replace doxycycline with clindamycin and rifampin. On October 2, 2020, PA Wingo determined that Plaintiff's HS had improved and his cellulitis was in remission. On October 7, 2020, Plaintiff filed this lawsuit. Soon thereafter, Dr. Kapur diagnosed Plaintiff with acute bronchitis and suspected Covid-19 and put him in isolation. Plaintiff continued his course of care for HS and back pain while he was in isolation. And on December 2, 2020, he was transferred to the Federal Medical Center in Texas.

**IV.  MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS WINGO, YATES, LANGLEY, WOOTEN, HILL, PHILLIPS, COOK AND POYNOR**

These eight Defendants say they are entitled to dismissal based on the doctrine of qualified

immunity.³ (Doc. 118.) Qualified immunity protects government officials from § 1983 liability for damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021). Whether qualified immunity applies to the case at hand is a question of law, not fact, for the court to decide. *Kelsay v. Ernest*, 933 F.3d 975, 981 (8th Cir. 2019). Defendants are entitled to qualified immunity if: (1) the evidence, viewed in the light most favorable to Plaintiff, does not establish a violation of a constitutional right; or (2) the constitutional right was not clearly established at the time of the alleged violation, such that a reasonable official would not have known that his or her actions were unlawful. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *MacKintrush v. Pulaski Cty. Sheriff's Dep't*, 987 F.3d 767, 770 (8th Cir. 2021). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson* 555 U.S. at 236; *Mogard v. City of Milbank*, 932 F.3d 1184, 1188 (8th Cir. 2019). Defendants say they are entitled to qualified immunity based on the first prong of the analysis. I agree.

The Eighth Amendment requires state prison officials to provide inmates with needed medical care." *Cullor v. Baldwin*, 830 F.3d 830, 836 (8th Cir. 2016). To defeat qualified immunity and proceed to trial, Plaintiff must have evidence that: (1) he had objectively serious medical needs; and (2) Defendants subjectively knew of, but deliberately disregarded, those serious

---

³ Qualified immunity applies to Plaintiff's request for monetary damages against Defendants, but not to his request for prospective injunctive relief. *See Hamner v. Burls*, 937 F.3d 1171, 1176 (8th Cir. 2019); *Mead v. Palmer,* 794 F.3d 932, 937 (8th Cir. 2015). However, injunctive relief is moot because Plaintiff is no longer at the federal prison in Arkansas. *See Zajrael v. Harmon*, 677 F.3d 353, 354 (8th Cir. 2012); *Owens v. Isaac*, 487 F.3d 561, 564 (8th Cir. 2007). And sovereign immunity prevents him from obtaining monetary damages from Defendants in their official capacities. *See Kaffenberger v. U.S.*, 314 F.3d 944, 950 (8th Cir. 2003); *Buford v. Runyon*, 160 F.3d 1199, 1203 (8th Cir. 1998).

medical needs. *See Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021); *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018). The parties agree Plaintiff had an objectively serious medical need for HS and back pain treatment. Thus, this case turns on the second element of deliberate indifference, which is a high threshold that goes well beyond negligence or gross negligence. *Johnson v. Leonard,* 929 F.3d 569, 575 (8th Cir. 2019). To establish deliberate indifference, there must be evidence Defendants "recognized that a substantial risk of harm existed <u>and</u> knew that their conduct was inappropriate in light of that risk." *Shipp,* 9 F.4th at 703 (emphasis in the original). This level of mental culpability is "akin to criminal recklessness." *Id*. And a mere disagreement with the course of medical care does not rise to the level of a constitutional violation. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010); *Barr*, 909 F.3d at 921-22. Keeping these principles in mind, I will discuss Plaintiff's allegations against each of these eight Defendants separately.

    A.    **PA Wingo**

Nothing in the record suggests PA Wingo acted with deliberate indifference when she treated Plaintiff's HS or back pain. To the contrary, the extensive medical records demonstrate that, for HS, PA Wingo: (1) examined Plaintiff on numerous occasions; (2) provided him with a variety of antibiotics, topical washes, and Humira shots; (3) obtained authorization non-formulary medications; (4) obtained permission for dermatologist and general surgeon consultations; (5) sought permission for him to see a plastic surgeon; (6) adjusted his medications according to lab cultures and the specialists' recommendations; (7) scheduled daily wound cleaning and treatments; (8) drained and cleaned his infected wounds several times; and (9) recommended he be transferred to a federal medical unit. And for Plaintiff's back pain, she: (1) examined Plaintiff several times; (2) ordered two x-rays and one MRI; (3) prescribed a variety of pain and anti-inflammatory medications; (4) increased those prescriptions when needed; and (5) gave him a TENS unit.

Nothing about this undisputed and escalating course of medical care suggests deliberate indifference. *See Fourte v. Faulkner Cnty.*, 746 F.3d 384, 390 (8th Cir. 2014) (no deliberate indifference when medical providers "made efforts to cure the problem in a reasonable and sensible manner"); *Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors were not deliberately indifferent when they treated the prisoner on "numerous occasions" and "made efforts to cure the problem in a reasonable and sensible manner").

To the contrary, Dr. Tomar, who is the Clinical Director for the federal prison in Arkansas, says that after doing an extensive review of Plaintiff's medical records it is her professional medical opinion he received prompt and medically appropriate care for HS and back pain. (Doc. 117-1 at 61-67.) And she says both conditions were aggravated by Plaintiff's obesity and significant history of failing to comply with the prescribed course of care.[4] *See Beck v. Skon*, 253 F.3d 330, 333-34 (8th Cir. 2001) (affirming summary judgment when, among other things, a prisoner failed to comply with the recommended treatment); *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) (finding a prisoner's "decision to decline medical treatment" was a relevant factor in granting summary judgment). "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that he did not feel he received adequate treatment." *Cejvanovic v. Ludwick*, 923 F.3d 503, 507-08 (8th Cir. 2019); *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997). Plaintiff has not offered any evidence to contradict Dr. Tomar's professional

---

[4] Plaintiff says he sometimes missed wound care because he was given supplies to do so himself, other medications made him too sleep to attend morning pill calls, and he missed his first x-ray because he thought it was for his shoulder that no longer hurt. (Doc. 131; Doc. 135.) But these explanations do not sufficiently rebut the extensive medical documentation of Plaintiff's repeated failures to comply with the prescribed course of care

medical opinion.

Citing physician-authored articles published in 2020 and 2021, Plaintiff says I&D's are no longer recommended, and PA Wingo made his HS worse when she performed that procedure.[5] (Doc. 132 at 26-58.) But the medical article provided by Plaintiff actually says I&D's are not recommended for "routine treatment of acute lesions" and that "the procedure should be limited to situations in which immediate relief of severe pain from an inflamed, fluctuant node is necessary." (Doc. 132 at 36.) According to the medical records, PA Wingo performed I&D's only when Plaintiff had infected and inflamed abscesses, which is consistent with the medical literature presented by Plaintiff. More importantly, "doctors remain free to exercise their independent medical judgment" and a disagreement about the appropriate course of care is not enough to sustain a constitutional violation. *Barr*, 909 F.3d at 921–22 (8th Cir. 2018). Further, even if PA Wingo had varied from recent changes in the standard of care for HS by performing I&D's, that departure would only be negligence or even gross negligence, which falls short of deliberate indifference. *Johnson,* 929 F.3d at 575; *see also Fourte*, 764 F.3d at 389 (the possibility

---

[5] Defendants say these articles are inadmissible hearsay. *See Brown v. United States,* 419 F.2d 337, 341 (8th Cir. 1969) ("medical treatises, recognized by the expert witness as authoritative, may be used in cross-examination, but are not admissible to prove the probative facts of opinions in the treatises since they are subject to the hearsay rule"); *Smith v. Matthews, No*. 16-6067-CV-SJ-FJG-P, 2017 WL 8792701, at *2 (W.D. Mo. Dec. 20, 2017) (medical articles from the internet were not verifying medical evidence sufficient to defeat summary judgment). However, because Plaintiff is proceeding *pro se* and has no access to expert testimony, I will consider the articles for their marginal relevance as discussed herein. And, I will be equally generous to Defendants by considering Dr. Brawell's one-page and largely conclusory affidavit which will be discussed later in this Memorandum and Order. *See Murr v. Midland Nat. Life Ins. Co*., 758 F.3d 1016, 1024 (8th Cir. 2014) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny motions for summary judgment"); *Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process").

that another physician in the same circumstances might have offered different tests or treatment than the prison medical staff is not enough to establish deliberate indifference). Nothing in the record suggests PA Wingo "recognized that a substantial risk of harm existed" and knew her "conduct was inappropriate in light of that risk" when she performed I&D's. *See Shipp,* 9 F.4th at 703.

Plaintiff also says PA Wingo was deliberately indifferent when she delayed his back MRI and specialist referrals. But the medical records demonstrate PA Wingo promptly entered both requests, which had to be approved and scheduled by non-parties. It is undisputed the January 2020 dermatology appointment and MRI were canceled due to a limited number of transport officers, and the April 2020 plastic surgery consultation and MRI were postponed due to Covid-19 restrictions. There is no evidence PA Wingo had control over either matter. More importantly, a "prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021). Plaintiff has not produced any such evidence. To the contrary, Dr. Tomar says, in her unchallenged declaration, Plaintiff's HS treatment was "prompt and timely" and his back pain was appropriately managed. (Doc. 117-1 at 61-62, 67). And the medical records clearly establish she escalated the course of care as Plaintiff's conditions evolved.

In a similar vein, Plaintiff says PA Wingo delayed in starting Humira shots. I find no evidence to support that allegation. In June 2019, the dermatologist recommended Plaintiff start Humira <u>after</u> his surgical wounds healed. But they did not heal until sometime in September 2019, when Plaintiff began to receive Humira as instructed by the dermatologist after his second appointment. And I note Plaintiff's HS condition progressively worsened even after he started

receiving Humira. Thus, even if there was a delay in receiving Humira, there is no evidence Plaintiff's HS condition was adversely affected. *See Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) (when "the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation").

Finally, Plaintiff says PA Wingo was deliberately indifferent by failing to refer him to a specialist for treatment of back pain. In support of that assertion, Plaintiff has produced medical records showing that in November 2017 (which was approximately a year before he arrived at the federal prison in Arkansas), he went to an emergency room in Kentucky for treatment of back pain. (Doc. 132 at 75-80.) During that encounter, Plaintiff reported he was being treated by a pain specialist, but there is no documentation to confirm that assertion. (*Id.*) After taking an x-ray which showed no significant abnormalities, the emergency room doctor gave Plaintiff a toradol injection for pain, issued a ten-day prescription for a muscle relaxant, instructed Plaintiff to take ibuprofen three times a day, and advised him to see a specialist if his pain continued. (*Id.*) This course of care is not significantly different from what was prescribed by PA Wingo.

Plaintiff has also produced March 2022 medicals records demonstrating that, after he was transferred to Texas, an anesthesiologist recommended his back pain be treated with steroid injections and possibly radio waves if the injections were unsuccessful. (Doc. 132 at 83-90.) But the care Plaintiff received almost two years after he last saw PA Wingo does not rebut Dr. Tomar's professional medical opinion that he received medically appropriate care. In particular, I note the anesthesiologist said he was recommending steroids and radio wave treatment because the previous course of care, which the parties agree PA Wingo increased over time, had not alleviated Plaintiff's subjective complaint of pain. In other words, the medical evidence shows the anesthesiologist has continued the progressive course of care started by PA Wingo, and not

contradicted it. Further, as previously stated, physicians are free to exercise their independent medical judgment and a disagreement between medical professionals about the appropriate treatment does not rise to the level of a constitutional violation. Finally and importantly, the "existence of a possible alternate course of treatment, which may or may not have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm." *Dulany,* 132 F.3d at 1241. Because the evidence viewed in the light most favorable to Plaintiff does not establish a violation of his constitutional right to receive adequate medical care, I find PA Wingo is entitled to qualified immunity.

### B. Registered Nurses Yates, Langley, Wooten and Medical Technician Hill

These four Defendants gave Plaintiff his various HS and back medications and treated his wounds on numerous occasions while he was in prison in Arkansas. Plaintiff says that: (1) in May 2019, Defendants Yates, Langley, and Wooten did not tell him he had a staph infection and delayed one to two hours in having him transported to the emergency room for HS treatment; (2) on various and sometimes unspecified occasions, Defendants Yates, Langley, and Wooten did not dress his wounds because they were too busy (but sometimes they give him supplies to do so himself); (3) Defendants Wooten and Langley caused him to miss one Humira shot in November 2019 due to a documentation error; (4) Defendants Wooten and Langley refused to see him after hours; and (5) Defendant Hill occasionally refused to give him his medication for non-medical reasons such as Plaintiff not having his identification card or being improperly dressed. (Docs. 131, 133, 134.)

But Plaintiff has not contradicted Dr. Tojar's professional medical opinion that the care they provided was medically appropriate. *Cejvanovic,* 923 F.3d at 507-08. And the alleged

14

occasional and scattered delays in care over a two-year period sound, at most, in negligence. *See Erin v. Busby,* 992 F.2d 147, 150-51 (8th Cir. 1993) (periodic, negligent failure to properly dispense prescription medications is not deliberate indifference, and thus, insufficient to sustain a constitutional claim); *Dulany,* 132 F.3d at 1245 ("A number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference"). Finally, Plaintiff has not presented any medical evidence demonstrating he was harmed by the alleged temporary delays in care. *See Redmond*, 999 F.3d at 1121; *Alberson*, 458 F.3d at 765–66. Because the evidence viewed in the light most favorable to Plaintiff does not show a constitutional violation, Defendants Yates, Langley, Wooten, and Hill they are entitled to qualified immunity.

### C. Infections Disease Nurses Cook and Phillips

Defendants Cook and Phillips have also raised qualified immunity. Plaintiff says that while he was quarantined for Covid-19 in May and June 2020, Defendants Cook and Phillips failed to process one or more of his sick call requests seeking treatment for HS. (Docs. 131, 134, 138.) But such negligence, or even gross negligence, is not enough to sustain a constitutional claim. And the medical records show Plaintiff was treated for HS five times in June 2020. Finally, Plaintiff has not explained how he was harmed by Defendant Cook's and Phillips's alleged failure to properly process his sick call requests. *See Redmond*, 999 F.3d at 1121; *Alberson*, 458 F.3d at 765–66. Accordingly, they are entitled to qualified immunity.

### D. HSA Poynor

Plaintiff alleges HSA Poynor improperly denied his grievances and said he would summarily deny all future grievances Plaintiff filed about his HS treatment. (Docs. 133, 134, 135, 138 at 68.) HSA Poynor argues he is entitled to qualified immunity because Plaintiff is seeking to hold him vicariously liable for the medical care provided by other individuals. *See Ashcroft v.*

*Iqbal*, 556 U.S. 662, 676 (2009) (because there is no vicarious liability in § 1983 actions, a prisoner "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). But I do not agree with that characterization of Plaintiff's claim. Instead, I read Plaintiff's pleadings as alleging HSA Poynor personally participated in the alleged inadequate medical care by failing to take corrective action after reading his grievances about HS, which is a plausible theory of recovery. *See Schaub v. VonWald*, 638 F.3d 905, 918-20 (8th Cir. 2011); *Langford,* 614 F.3d at 460-62.

Nevertheless, I conclude HSA Poynor is entitled to qualified immunity because there is no evidence Plaintiff received constitutionally inadequate medical care. In other words, summary judgment is warranted because there is no evidence of a constitutional violation HSA Poynor should have corrected. *See Parrish v. Ball,* 594 F.3d 99, 1002 (8th Cir. 2010) (to prevail on a corrective inaction claim, a prisoner must establish the defendants failed to correct a known constitutional violation); *Marsh v. Phelps Cty.*, 902 F.3d 745, 754-57 (8th Cir. 2018) (to sustain a corrective inaction claim, the supervisor must have actual knowledge of a constitutional violation that needs to be corrected).

**V.     MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS OBI-OKOYE AND KAPUR**

Drs. Obi-Okoye and Kapur do not assert qualified immunity. (Docs. 119-121.) Instead, they argue they are entitled to judgment as a matter of law because there is no evidence they were deliberately indifferent to Plaintiff's medical needs. I agree.

As previously summarized, the medical records demonstrate Dr. Obi-Okoye took "reasonable and sensible" efforts to treat Plaintiff's HS and lower back pain by prescribing a variety of antibiotics and pain medications, referring him to appropriate specialists, and following

the specialists' recommendations. *See Fourte*, 746 F.3d at 390. And Dr. Kapur, who had a very limited role in Plaintiff's care, promptly renewed Plaintiff's various prescribed medications. Significantly, Dr. Thomas Braswell, who is a private emergency physician in Arkansas, says it is his professional medical opinion that Drs. Obi-Okoye and Kapur provided "appropriate, adequate, and timely" medical care for Plaintiff's HS and back pain. (Doc. 121-2 at 1.) Plaintiff has not offered any contrary medical evidence. *Cejvanovic*, 923 F.3d at 507-08.

Instead, Plaintiff says Drs. Obi-Okoye and Kapur were deliberately indifferent by treating his HS with antibiotics, instead of laser and light therapies, corticosteroid injections, and surgery. (Doc. 132.) Plaintiff also challenges Dr. Obi-Okoye's decision, in February 2019, to treat an HS knot on his neck with antibiotics instead of draining it. And he claims both doctors delayed giving him Humira as recommended in 2017 by a private PA in Kentucky. (*Id.*) But the PA's recommendation actually says she "discussed the possibility of adding Humira in the future." (Doc. 132 at 62) (emphasis added.) Further, as previously discussed, doctors are free to exercise their professional medical judgment on the appropriate care. *See Barr,* 909 F.3d at 921–22. And there is no evidence Plaintiff was harmed by any delay in receiving Humira (which did not significantly improve his condition) or other types of treatment for HS. *See Redmond*, 999 F.3d at 1121; *Alberson*, 458 F.3d at 765–66.

Plaintiff also says Drs. Obi-Okoye and Kapur were deliberately indifferent by refusing to refer him to a pain specialist for his back pain because it was too expensive. But I find nothing in the record to confirm that assertion. As explained when discussing Plaintiff's similar claim against PA Wingo, the care Plaintiff received for his back pain prior to his incarceration is substantially the same as provided by Defendants. And the care his received in March 2022, which was almost two years after he left Arkansas, is a logical progression of care over time. It does not sufficiently

refute the medical experts' opinions that the care Defendants provided to Plaintiff was medically appropriate at the time it was rendered. Nothing in the record suggests Drs. Obi-Okoye or Kapur "recognized that a substantial risk of harm existed <u>and</u> knew that their conduct was inappropriate in light of that risk." *Shipp,* 9 F.4th at 703. Accordingly, they are entitled to judgment as a matter of law.

## VI.   CONCLUSION

In sum, Plaintiff did not have an Eighth Amendment right to receive the medical care of his choosing for HS or back pain. I am sympathetic to the considerable pain, discomfort, and frustration the progressing and uncurable HS, as well as chronic back pain, caused Plaintiff. But as explained at the beginning of this Memorandum and Order, deliberate indifference is a high threshold. The medical records and unrefuted opinions from two experts demonstrate Defendants were not deliberately indifferent to his serious medical needs. Plaintiff's mere disagreement with the extensive and escalating medical care he received does not rise to the level of a constitutional violation. *See Barr,* 909 F.3d at 921-22. Because no reasonable juror could rule in Plaintiff's favor based on the record before me, Defendants are entitled to summary judgment.

IT IS, THEREFORE, ORDERED that:

1.   Defendants' Motion for Summary Judgment (Doc. 116) is GRANTED and Plaintiff's claims against Defendants Cook, Hill, Langley, Phillips, Poynor, Wingo, Wooten, and Yates are DISMISSED with prejudice.

2.   Defendants' Motion for Summary Judgment (Doc. 119) is GRANTED, and Plaintiff's claims against Defendants Obi-Okoye and Kapur are DISMISSED with prejudice.

3.   This case is closed.

4.   I certify, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from

this Memorandum and Order as well as the accompanying Judgment would not be taken in good faith.

    DATED this 12th day of August 2022.

                                                        _____
                                                        JOE J. VOLPE
                                                        UNITED STATES MAGISTRATE JUDGE